14309

DELK v. LIGGETT & MYERS TOBACCO CO.

(186 S. E., 383)

March, 1935.

*Messrs. Benet, Shand & McGowan* and *Blatt & Fales,* for appellant,

*Messrs. Edgar A. Brown* and *Thos. M. Boulware,* for respondent,

June 10, 1936.

The opinion of the Court was delivered by MR. JUSTICE BAKER.

This action was instituted in the Court of Common Pleas for Barnwell County on February 13, 1935, for the purpose of recovering damages for personal injuries alleged to have been due, caused, and occasioned by the negligence of appellant in the manufacture of its product known as "Spark Plug" chewing tobacco.

By his complaint, respondent alleges that some time prior to September 3, 1934, appellant sold to Eppes Pharmacy in Blackville, S. C., a box of Spark Plug tobacco, wholesale, to the end that same might be sold by said pharmacy to members of the public who desired to purchase same; that appellant as a manufacturer of this tobacco held itself out to the world as manufacturing a chewing tobacco free from harmful and dangerous substances and for the purpose of being chewed by human beings; that on September 3, 1934, respondent purchased from said pharmacy a joint of said tobacco so sold to said pharmacy by appellant; that after placing a piece of same in his mouth, respondent bit down on it and a carpet tack concealed therein stuck between his gum, and a tooth, causing the respondent to suffer most excruciating pain; that although respondent obtained the best treatment possible, the nerve of the tooth died and said tooth became infected; that for ten days, respondent was unable to eat anything except liquids; that respondent was put to considerable expense and underwent great pain and suffering, all to his damage in the sum of $3,000.00; that said injuries and damage to respondent were directly and proximately caused by negligence of appellant, in that its said manufactured article was not free from harmful and dangerous substances, in that appellant failed to see and make certain that said tobacco contained no harmful and dangerous substances, and in that the said tobacco was not adapted to the purposes for which it was manufactured.

Appellant by its answer admits the formal allegations of the complaint, denies all others, and, further answering, alleges that as a manufacturer of Spark Plug tobacco it uses utmost care in the manufacture thereof, and that when said tobacco was shipped to its customers, including Eppes Pharmacy, it was in good condition and free from any foreign substance; that appellant made no sale of said tobacco to respondent and there was no relation between them which would support this action by respondent.

The case came on for trial before his Honor, Judge C. J. Ramage, and a jury, on March 22, 1935. At proper stages of the trial of the case, appellant made motions for nonsuit and directed verdict, both of which were based on the following grounds:

1. That the defendant owed the plaintiff no duty with reference to the tobacco, because of the absence of any contractual relationship between it and the plaintiff; and,

2. That there has been no proof of negligence on the part of the defendant in the manufacture of the said plug of tobacco.

Both of said motions were overruled, and the case was submitted to the jury and resulted in a verdict for respondent in the sum of $500.00. Appellant made a motion for a new trial and his Honor, Judge Ramage, handed down an order granting a new trial *nisi,* unless respondent remitted on the record all of the verdict over and above the sum of $400.00.

Appellant has filed three exceptions to the judgment of the trial Court, which raise the following questions:

1. Did the trial Court err in refusing appellant's motion for a directed verdict based on the ground that appellant owed respondent no duty with reference to the tobacco, because of the absence of any contractual relationship between it and the plaintiff; said tobacco having passed through a jobber and retailer before coming into hands of respondent?

2. Did the trial Court err in refusing appellant's motion for a directed verdict based on the ground that there was no proof of negligence on the part of defendant in the manufacture of said tobacco?

3. Did the trial Judge err in charging the jury as follows: "I charge you, gentlemen—the plaintiff has handed up this request—that where a manufacturer manufactures an article intended for human use and represented as being safe for human use, the manufacturer is under a duty to use ordinary care to insure that article being safe for human use and free from elements that would be harmful or dangerous to persons using the article before placing the same on the market to be purchased by the public either from the manufacturer or from a retailer"?

As to Question 1, it is a general rule that the manufacturer of an article is not liable to a third person with whom he has no contractual relations for negligence in its manufacture, but this rule is subject to certain well-recognized exceptions and qualifications. One of the principal exceptions to the general rule is made in cases of food, beverages, confections, and condiments which are unfit or unwholesome for human consumption, but are placed on the market and are apparently fit and wholesome for human consumption.

For what purpose is chewing tobacco manufactured and sold? For the sole purpose of human consumption is the only logical, reasonable conclusion. Chewing tobacco, like food, is taken into the mouth and thoroughly masticated by its users, as a food would be. It is a well-known fact that a certain amount of the ingredients used in the manufacture of chewing tobacco will inevitably pass from the mouth of the user to the stomach, there be digested, and become a part of the human body as any food eaten by an individual. If chewing tobacco is unfit for human consumption by reason of tacks mixed with it, the very purpose for which it is intended to be used prevents a distinction between chewing tobacco and candies, foods, beverages, and condiments.

In the case of *Tate v. Mauldin,* 157 S. C., 392, 154 S. E., 431, 433, Mr. Justice Blease quotes with approbation from the case of *Crigger v. Coca-Cola Bottling Company,* 132 Tenn., 545, 179 S. W., 155, 157, L. R. A., 1916-B, 877, Ann. Cas., 1917-B, 572, as follows: " 'That one who prepares and puts on the market, in bottles or sealed packages, foods, drugs, beverages, medicines, or articles inherently dangerous owes a high duty to the public, in the care and preparation of such commodities, and that a liability will exist regardless of privity of contract to any one injured for a failure to properly safeguard and perform that duty.' "

In 88 A. L. R., at page 531, the following appears: "A tobacco manufacturer was held liable to the purchaser of a plug of tobacco from a retailer, where the purchaser bit into a worm with many stingers on it, over a hundred of which became imbedded in his mouth, in *Liggett & M. Tobacco Co. v. Rankin* (1932), 246 Ky., 65, 54 S. W. (2d), 612, the Court observing that, while tobacco is not a food, the case could not be distinguished from those where poison is found in other articles manufactured and sold for human consumption."

See, also, *Pillars v. R. J. Reynolds Tobacco Co.,* 117 Miss., 490, 78 So., 365; annotation, 17 A. L. R., 695; *Foley v. Liggett & Myers Tobacco Co.,* 136 Misc., 468, 241 N. Y. S., 233, affirmed 232 App. Div., 822, 249 N. Y. S., 924; 88 A. L. R., 532.

We are constrained to hold that the trial Judge was not in error in refusing the motion of appellant predicated upon the theory there was not such privity of contract as would enable respondent to maintain his action against appellant for alleged negligence.

The second question has given the writer hereof considerable concern. It seems to be the settled law in this State no recovery can be had in a case of this kind except upon some negligent act or omission. In *Tate v. Mauldin, supra,* on this point, Mr. Justice Blease quoted

with approval from the case of *Crigger v. Coca-Cola Bottling Co., supra,* as follows: " 'This liability is based on an omission of duty .or an act of negligence, and the way should be left open for the innocent to escape. However exacting the duty or high the degree of care to furnish pure foods, beverages, and medicines, we believe with Judge Cooley, as expressed in *Brown v. Marshall, supra* (47 Mich., 576, 11 N. W., 392, 41 Am. Rep., 728), that negligence is a necessary element in the right of action, and the better authorities have not gone so far as to dispense with actual negligence as a prerequisite to the liability. In fact, there is no logical basis of liability for personal injury without some negligent act or omission'."

In the *Tate case,* as in the other cases which have been before this Court, the statute of this State known as the pure food and drug Act applied, and where deleterious matter was found in food or beverages, especially a fly, part of a decomposed mouse, and similar foreign matter, the Court held that the statute having been violated by the sale of such foods or beverages, it was *prima facie* evidence of negligence; and also that it was a question for the jury if a proper inspection would have disclosed the deleterious matter.

A somewhat similar case to the case under consideration is *Corum v. R. J. Reynolds Tobacco Co.,* 205 N. C., 213, 171 S. E., 78, in which a fishhook was imbedded in a plug of tobacco, and when the ultimate consumer bit off or pulled off a chew from the plug, the fishhook stuck through his lip. There was also evidence of other foreign substance in the same brand of tobacco and of complaints to the foreman of the machine room of foreign substances. The Court held that this testimony, together with the fact that the plug of tobacco showed the imprint of the fishhook in it, was sufficient to make it mandatory to submit the issue of negligence to the jury, independent of and without invoking the maxim, *res ipsa loquitur.*

The doctrine of *res ipsa loquitur* does not prevail in this State.

Verdicts cannot rest upon guess or conjecture. A plaintiff must prove negligence affirmatively. See *Weston v. Hillyer*, 160 S. C., 541, 159 S. E., 390.

While tobacco manufactured for the purpose of chewing necessarily should be in the same classification as food in so far as negligence in its manufacture, it does not come within the pure food and drug Act (Section 1452, Code 1932), of this State; said statute being penal and of necessity must be strictly construed.

The record in this case discloses:

Respondent purchased a plug of Spark Plug chewing tobacco from a retailer; that he had bitten several pieces from said plug; that he kept the tobacco in his trouser pocket in which there was nothing but the tobacco; that he bit off a chew from the plug and commenced to chew same; that a tack in the tobacco penetrated his gum causing great pain and suffering. The retailer from whom the tobacco was purchased, he having purchased it from a jobber, testified he didn't put the tack in the tobacco.

When the remnant of the plug was offered in evidence, counsel for plaintiff (respondent), stated he wanted the jury to examine it and they would see horse hairs in it. Upon objecton, the Court ruled as follows: "They can look at the piece of tobacco, but the only thing that they can consider would be a tack or something like that that is alleged in the complaint, and not a horse hair. They have a right to look at the tobacco, but I tell the jury that they have set up that there was a tack in it, and anything else found there could not be considered."

Later, upon the cross examination of appellant's witness, the following took place:

"Q. Ordinarily, of course, tobacco is not mixed with tacks? A. No, sir.

"Q. But you see horse hair in this tobacco? A. I didn't see it.

"Q. Is that horse hair, or what kind of hair is it in the tobacco (indicating to the witness?) A. I don't know whether it is a hair or not."

Appellant's testimony was to the effect that after the tobacco is purchased from the farmer, it is cleaned and packed at a warehouse and shipped to another warehouse for storage; then it is unpacked and cleaned and left there for storage and to age for a length of time. After it has aged it is cleaned again, and sent to the manufacturing room where the flavoring is applied; the plug is made by clean machinery, and packed in air-proof packages of paraffin paper and is waterproof; those packages are packed in one-pound packages, and the caddie or package itself is made of cardboard, no tacks used in the manufacture or thereabouts, though tobacco in stages of handling is packed in hogsetts, having hopps on them and heads.

It will be noted that in the reported cases where there is held to be a presumption of negligence from foreign substance in foods or beverages, such foreign substance consisted of worms, decomposed human toe, decomposed mouse, and such like, such as necessarily became mixed therewith at the time of manufacture, and which was bound to be due to negligence in the manufacture or in the inspection of the manufactured article, and has not included such foreign substance as a common ordinary tack, handled every day by people of all walks of life. Nor can we say that, unless the tack was in the plug of tobacco perpendicularly, an inspection would have disclosed its presence. The respondent had the plug in his possession for some length of time at least and did not discover it. The trial Judge in this case explicitly excluded evidence of any other foreign substance in the tobacco, if any existed, except something like a tack.

A much stronger case than the one at bar, and very similar, is that of *Flora Ash v. Childs Dining Hall Co.,* 231 Mass., 86, 120 N. E., 396, 4 A. L. R., 1556, and is cited and quoted with approval by Mr. Justice Bonham, writing the opinion of the Court in *Weston v. Hillyer, supra,* and

we here reproduce so much of the *Ash case* as was quoted by Justice Bonham:

" 'The testimony of the plaintiff tended to show that she received injuries from the presence of a tack in a piece of blueberry pie which she was eating while a guest of the defendant in its restaurant. * * *

" 'There is nothing in the record from which it can be inferred that the harm to the plaintiff resulted directly from any failure of duty on the part of the defendant. The precise cause of her injury is left to conjecture. It may as reasonably be attributed to a condition for which no liability attaches to the defendant as to one for which it is responsible.' "

It is true that negligence may be established by circumstantial evidence as well as by positive evidence; but it is also a well-settled precept founded upon the soundest principles of justice that a verdict must be supported by the evidence and not based upon conjecture, speculation, and surmise. Has respondent adduced testimony, positive or circumstantial, sufficient to show negligence on the part of appellant? We think not. The plug of tobacco was carried around in his pocket until he had taken four or five chews of same, and there was no proof of an impression made by the tack on or in said plug to show that when the tobacco was pressed the tack became a part of said plug. It is entirely possible that this tack could have become imbedded in this plug during the time that it was in possession of the jobber, retailer, or respondent.

In respondent's brief, it is argued that the testimony or colloquy hereinabove quoted showed horse hair in the tobacco and was evidence of negligence. In the first place, the trial Judge excluded such "testimony" from the case. In the second place, such "testimony" consisted of a direct statement by counsel for respondent and then a statement in the form of question by the same counsel. Respondent also urges that the testimony shows that the tack was imbedded in the tobacco. It is true that counsel for respondent asked

him if the tack was "imbedded" in the tobacco, to which he replied in the affirmative; but in view of respondent's testimony just preceding, it cannot be claimed that respondent intended to convey the impression that the tack was so "imbedded" in the tobacco as to leave an imprint, as in the *Corum case, supra,* and thus evidence that the tack was in the tobacco before leaving the manufacturer.

This exception must be sustained

As to the third question:

Appellant contends that tobacco is not a food nor is it inherently dangerous, and therefore that the charge is not a correct statement of the law governing the case at bar. Inasmuch as it has already been shown in discussing question one, that chewing tobacco is in the same category with foods, beverages, confections, and condiments, it is clear that the trial Court committed no error in charging the jury as hereinabove set out.

Having held that the trial Judge was in error in not granting appellant's motion for directed verdict on the second ground, the case is remanded to the Circuit Court, with directions to enter judgment in favor of appellant under Rule 27.

Mr. Chief Justice Stabler and Messrs. Justices Bonham and Fishburne concur.

Mr. Justice Carter (dissenting): I agree with the leading opinion in this case, in so far as the writer thereof holds, in effect, that the rule applicable in cases of food, beverages, confectioneries, etc., placed on the market as apparently fit and wholesome for human consumption, is applicable to chewing tobacco manufactured and sold for human consumption, and therefore the trial Judge committed no error in ruling and charging the jury to that effect in the case at bar. I further agree with the holding expressed by the writer of the leading opinion that the trial Judge committed no error in refusing to direct a verdict for the defendant "predicated upon the theory there was not such privity of contract as would enable respondent to maintain his action

against appellant for alleged negligence." However, I am unable to agree with the holding that the trial Judge should have directed a verdict for the defendant because of lack of proof of some negligent act or omission, causing the injury complained of. It is true, as stated in the leading opinion, the doctrine of *res ipsa loquitur* does not prevail in this State and verdicts cannot rest upon "guess or conjecture," and negligence must be proven affirmatively; but such negligence may be shown by inferential or circumstantial evidence as well as by direct evidence, and, in my opinion, the trial Judge committed no error in submitting that issue to the jury. In this connection I call attention to the following portion of the testimony given by the plaintiff:

"Q. When you bought the tobacco, what did you do with it? A. I started to chewing it. I took four or five chews. I kept it in the left-hand pants pockets. There was nothing in the world in the pants pocket except that piece of tobacco. I bit this piece of tobacco off, and started chewing it, and this tack went up into the gum and by the side of the third jaw tooth.

"Q. It this the remnant of that chew of tobacco and the tack that was in that chew of tobacco (indicating to witness)? A. Yes, sir; that is it.

"Q. That is the part of it? A. Yes, sir.

"Mr. Bush: We offer in evidence the chew of tobacco that he took at the time and the tack that was in it.

"Q. When you took this chew of tobacco you bit it off, and bit down on to it, *and this tack was imbedded in the tobacco?* [Italics added.] A. Yes, sir.

"Q. What was the effect on you when you bit down on it and that tack went up into your tooth? A. I had an awful pain, and I almost fainted, and as soon as I felt it in there I ran my finger in there, and I could feel the head of the tack, and I couldn't get it out, and I went to my son and asked him to see if he could pull it out, and he tried to reach in there and get it in his finger, but he could not. I was at

the Pure Oil Service Station, near the doctor's office, across the street. I went to Dr. Kneece's office, and had him take it out, with some kind of a tweezer. Afterwards I suffered pain for about ten days or two weeks. My jaw swelled up, and I couldn't eat anything solid for about eight days. It was sore and the tooth was decayed and turned dark. It was a perfect jaw tooth before, and it never did give me any trouble before. I had the attention of a physician. He treated it for about ten days or two weeks. During that time I suffered much pain. I could not sleep at night, and I had to take aspirin to get any sleep at all. It was a perfect tooth before this tack was driven into it. It was white. It has now turned dark. It gives me trouble. On the inside where the injury was it still swells up and turns sore, and it does that every few days. Prior to the time that the tack went into the tooth I never had any trouble with it before, and have had trouble with it ever since."

This testimony, in my opinion, was sufficient to take the case to the jury on the issue as to whether or not the defendant was negligent in the manufacture of the tobacco in question and whether such negligence resulted in injury to the plaintiff. In this connection, I especially call attention to the following question and answer quoted above:

"Q. When you took this chew of tobacco you bit it off, and bit down on it, and this tack was imbedded in the tobacco? A. Yes, sir."

It is clear that the plaintiff, in effect, testified that the tack in question was imbedded in the tobacco in question, and I may add that I find nothing in the record tending to show that the plaintiff intended to convey any other meaning, and whether he intended to convey any other meaning was a question for the jury and not for the Court. It has long been the recognized rule in the Courts in this State that even where the witness, in the course of his testimony, makes contradictory statements, it is for the jury to say which statement is correct and true and not for the Court to say.

Under my view of the record all of the appellant's exceptions should be overruled and the judgment of the lower Court affirmed.